IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


JESSICA A. CONNOR                      )
                                       )
v.                                     )          No. 2:10-0064
                                       )
MICHAEL J. ASTRUE,                     )
          Commissioner of Social Security   )



To: The Honorable Thomas A. Wiseman, Senior District Judge



### REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform unskilled and limited sedentary work (tr 21) during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) should be denied.

1

# I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on June 20, 2005, alleging a disability onset date of July 1, 2003, due to scar tissue in her reproductive organs, depression, and anxiety. (Tr. 25-27, 73-75.) Her applications were denied initially and upon reconsideration. (Tr. 25-27, 58-60, 64-67.) A hearing before Administrative Law Judge ("ALJ") Jack Williams was held on June 17, 2008. (tr. 310-30) and the plaintiff amended her alleged onset date to May 16, 2005. (Tr. 23.) The ALJ delivered an unfavorable decision on September 2, 2008 (tr. 13-22), and the plaintiff sought review by the Appeals Council. (Tr. 5.) On May 18, 2010, the Appeals Council denied the plaintiff's request for review (tr. 2-4), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on April 5, 1982, and was 23 years old as of May 16, 2005, her alleged onset date. (Tr. 29, 315.) She completed her GED and worked as a fast food worker, shipping/receiving clerk, and industrial truck operator. (Tr. 124, 315-17.)

## A. Chronological Background: Procedural Developments and Medical Records

### 1. Physical Impairments[1]

The plaintiff has a long history of pelvic pain that began at age three when she was diagnosed with ovarian cancer, received chemotherapy, and had an epidermoid cell or a germline tumor

---

[1] The Court will only briefly address the plaintiff's physical impairments since her "Statement of Errors" focuses on her mental impairments. Docket Entry No. 15, at 4-12.

removed. (Tr. 243, 247, 288.) When the plaintiff was 21 years old, in June of 2003, Dr. Mike Cassal attempted to perform a hysterectomy on the plaintiff, due to her "increasing pelvic pain," but "the procedure was stopped when enterotomy and multiple adhesions thwarted attempts at reaching the uterus." (Tr. 288.) However, on July 20, 2003, Dr. John Currie, a surgeon at Vanderbilt University Medical Center, performed a complete hysterectomy on the plaintiff. (Tr. 290-93.) Between May of 2005, and March of 2007, the plaintiff presented to Byrdstown Medical Center on several occasions with complaints of lower abdominal pain, back pain, right knee pain, and fistula leakage. (Tr. 154-74.)

### 2. Mental Impairments

Between January and December of 2005, the plaintiff presented to Women's Health Services in Livingston, Tennessee, on multiple occasions (tr. 295-307) and reported having mood swings. (Tr. 295, 297, 299.) Although she was diagnosed with depression disorder (tr. 295), she denied having "feelings of depression." (Tr. 295, 307.)

From January of 2005 to February of 2008, the plaintiff presented to Dr. Viswa Durvasula, a psychiatrist, on multiple occasions with complaints of being stressed and anxious. (Tr. 182-83, 223-42.) Dr. Durvasula opined that the plaintiff was alert and oriented, had organized thinking and an intact memory, had fair concentration (*id.*), was depressed (tr.225, 231, 236, 239) and anxious (tr. 223-23, 227, 233-35), and was prescribed Seroquel.[2] (Tr. 240.) The plaintiff reported to Dr. Durvasula that she was "doing all right" or "well" (tr. 182, 228, 231, 240), that her medications

---

[2] Seroquel is used to treat bipolar disorder and schizophrenia. Physicians Desk Reference 735 (65th ed. 2011) ("PDR").

were working "okay" (tr. 183), that she had no complaints (tr. 231), that she traveled to Las Vegas (tr. 228), and that Seroquel kept her irritability "in check." (Tr. 240.) Dr. Durvasula also noted that the plaintiff's medications were not adjusted during her treatment. (Tr. 182-83, 223-42.)

On January 1, 2006, Jerell F. Killian, a consultative psychological examiner, completed a psychological evaluation (tr. 197-99) and the plaintiff reported that she "shares the homemaking activities" with her roommate and that "she can manage these types of activities at a standard rate but has to be careful not to do anything which requires more than an absolute minimal exertion and/or strain less [sic] she develop further medical complications." (Tr. 198.) The plaintiff then related that she "has a tendency to feel tense if confined or restricted" and "has been experiencing feelings of helplessness and hopelessness," but that she "has never been seriously distressed," that her "medication is working well at keeping her present discomfort to a minimum," and that she "is sometimes irritable but has never been violent." *Id.* Mr. Killian found that the plaintiff exhibited no signs of distress during the session; that she was "friendly, upbeat, polite, and spontaneous;" and that she was alert and well-oriented. (Tr. 198-99.) Mr. Killian diagnosed the plaintiff with adjustment disorder with mixed anxiety and depressed mood but noted that her anxiety and depression had little impact on her "cognitive functions, socialization, or adaptability." (Tr. 199.)

On February 8, 2006, Dr. James Moore, a nonexamining Tennessee Disability Determination Section ("DDS") consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment (tr. 200-07) and determined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently. (Tr. 201.) He opined that in an eight hour workday the plaintiff could stand/walk at least two hours and sit for about six hours, and that the plaintiff's ability to push/pull was unlimited. (Tr. 201.)

On February 10, 2006, Dr. Victor O'Bryan, Ph.D., a nonexamining DDS consultant, completed a Psychiatric Review Technique Form ("PRTF") (tr. 208-20) and diagnosed the plaintiff with adjustment disorder. (Tr. 211, 213.) He concluded that the plaintiff had mild restriction of activities of daily living and mild difficulties in maintaining social functioning and concentration, persistence, or pace, and that she had no episodes of decompensation. (Tr. 218.) Dr. O'Bryan also opined that the plaintiff's psychiatric impairment was not severe. (Tr. 220.)

On December 1, 2007, Dr. Durvasula completed a Mental Impairment Questionnaire (tr. 179-81) and found that the plaintiff's symptoms included sleep disturbance, mood disturbance, emotional liability, recurrent panic attacks, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, decreased energy, generalized persistent anxiety, and hostility and irritability. (Tr. 179.) Dr. Durvasula diagnosed the plaintiff with moderate depression, anxiety, and panic attacks, and assigned her a Global Assessment of Functioning ("GAF") score of 50.[3] (Tr. 179.) Dr. Durvasula reported that the plaintiff had poor concentration and was very easily stressed, that her "psychiatric condition exacerbate[s] [her] experience of pain or any other physical symptom," and that her impairments or treatment would cause her to miss work more than three times a month. (Tr. 180.) Dr. Durvasula noted that the plaintiff does "some[what] better" on medication and that she was taking Remeron,[4] Valium,[5] and Seroquel. *Id.*

---

[3] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

[4] Remeron is an antidepressant. Saunders Pharmaceutical Word Book 608 (2009) ("Saunders").

[5] Valium is a "benzodiazepine sedative; anxiolytic; skeletal muscle relaxant; anticonvulsant; [and] alcohol withdrawal aid." Saunders at 745.

She determined that the plaintiff had moderate restrictions of activities and moderate difficulties in maintaining social functioning; had constant "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in timely manner;" and had continual episodes of deterioration or decompensation in work or work-like settings.[6] (Tr. 181.)

## B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by a non-attorney social security advocate,[7] and the plaintiff and Dr. J.D. Flynn, a vocational expert ("VE"), testified. (Tr. 310-31.) The plaintiff testified that she has a GED and that she worked as a shipping/receiving clerk, which involved "heavy lifting, packaging shipments, transmission products, and forklift operation." (Tr. 315-16.) The plaintiff explained that she is not able to sit/stand "for any period of time," that she is unable to lift anything heavier than her shoes, and that she cannot do any of her past hobbies because she is afraid of her "intestines bursting open" after having several abdominal surgeries. (Tr. 318.) The plaintiff testified that she has constant dull pain in her abdomen, that she has to shift position every 15-20 minutes when sitting down and every 30 minutes when standing up, and that she is able to lift and carry ten pounds on an occasional basis. (Tr. 319.)

The plaintiff related that she attends counseling every three months for depression and anxiety. *Id.* She explained that she first became depressed after her abdominal surgeries precluded

---

[6] As the ALJ pointed out (tr. 17), there is no evidence of the plaintiff's having ever had episodes of decompensation nor is it clear to what symptoms Dr. Durvasula may have been referring.

[7] Although the plaintiff indicates that she was represented by counsel, Docket Entry No. 15, at 2, it appears that her representative at the hearing was not an attorney.

her from working and that she occasionally has to call Dr. Durvasula to schedule additional therapy sessions when she becomes nervous and stressed. (Tr. 320.) The plaintiff also testified that she "lost" one job because of her emotional problems and temper, that she has trouble sleeping and is on medication to treat those symptoms, that she takes naps daily, and that she has trouble concentrating and staying on task. (Tr. 320-21.)

The plaintiff related that she lives with a friend, does laundry, plays dominos and cards with a neighbor every other week, watches television and plays on the computer, and drives short distances. (Tr. 323-24.) She testified that she has panic attacks that last for 15 to 20 minutes on a daily basis and that she usually lies down until the attacks subside. (Tr. 324.)

The VE, consistent with the Dictionary of Occupational Titles, classified the plaintiff's past work as a cashier as light and unskilled, her job as a shipping and receiving clerk as medium and skilled, and her work as an industrial truck operator as medium and semiskilled. (Tr. 327, 329.) The ALJ asked the VE what type of work the plaintiff could perform if she had a history of depression, anxiety, panic attacks, abdominal surgeries that limited her to sedentary exertion, a residual fistula that occasionally leaks, anger management problems, mild to moderate emotional problems, and difficulty working closely with others. (Tr. 327-28.) The VE answered that the plaintiff could not perform her past relevant work but could perform work as an office clerk, which is sedentary and unskilled; as a production, planning, and expediting clerk, which is sedentary and unskilled; and as a surveillance system monitor, which is sedentary and unskilled. (Tr. 328-29.) The VE also testified that employers tolerate only two absences from work per month and that if the plaintiff's testimony were credible that she would be precluded from working. (Tr. 329.)

# III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on September 2, 2008. (Tr. 13-22.)  Based on the record, the ALJ made the following findings:

1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2)     The claimant has not engaged in substantial gainful activity since May 16, 2005, the alleged onset date (20 CFR 404.1520(b), 404. 1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

\*\*\*

3)     The claimant has the following severe combination of impairments: history of multiple abdominal surgeries with a residual lower abdominal fistula, and adjustment disorder with mixed anxiety and depressed mood (20 CFR 404.1520(c)  and 416.920(c)).

\*\*\*

4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in  20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926.)

\*\*\*

5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she cannot relate closely to others.

\*\*\*

6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\*\*\*

7) The claimant was born on April 5, 1982 and was 23 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

***

11) The claimant has not been under a disability, as defined in the Social Security Act, from May 16, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-21).


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's

decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she

seeks disability benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 803-04 (6th Cir. Jan. 15, 2008). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." *Heston*, 245 F.3d at 534. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve

months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Heston*, 245 F.3d at 534. *See also Vance*, 260 Fed. Appx. at 803-04. The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner to meet his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations.

*Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[8] *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 21.) At step one, the ALJ found that the plaintiff demonstrated that she had not engaged in substantial gainful activity since May 16, 2005, the alleged onset date of disability. (Tr. 15.) At step two, the ALJ determined that the plaintiff's history of multiple abdominal surgeries with a residual lower abdominal fistula and adjustment disorder with mixed anxiety and depressed mood were severe impairments. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. (Tr. 16.) At step four, the ALJ determined that the plaintiff had an RFC

---

[8] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

to perform sedentary work but that she could not perform her past relevant work. (Tr. 17.) At step

five, the ALJ concluded that the plaintiff's RFC allowed her to perform work as a general office

clerk; as a production, planning, or expediting clerk; and as a surveillance system monitor. (Tr. 21.)

## C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in determining that her mental impairments were

not severe and in evaluating the medical findings of her treating psychiatrist. Docket Entry No. 15,

at 7-11. The plaintiff also argues that the ALJ erred in concluding that she did not meet or medically

equal Listing 12.04. Docket Entry No. 12, at 5-6.

### 1. The ALJ did conclude that the plaintiff's mental impairments were severe.

The plaintiff argues that the ALJ erred in determining that her mental impairments were not

severe. Docket Entry No. 15, at 7-9. As discussed *supra*, a "severe impairment" is one which

"significantly limits . . . physical or mental ability to do basic work activities." *Heston*, 245 F.3d at

534 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). However, as correctly pointed out by the

defendant (Docket Entry No. 18, at 7-8), at step two of the five step sequential process the ALJ

concluded that the plaintiff's "adjustment disorder with mixed anxiety and depressed mood" were

severe impairments. (Tr. 16.) Therefore, the plaintiff's first contention is without merit since the

ALJ did find that the plaintiff's mental impairments were severe.

**2. The ALJ properly assigned no weight to the findings of the plaintiff's treating psychiatrist.**

The plaintiff argues that the ALJ erred in assigning no weight Dr. Durvasula's medical findings, specifically her Mental Impairment Questionnaire. Docket Entry No. 15, at 9-11. Given the regularity with which Dr. Durvasula examined the plaintiff (tr.182-83, 223-42), she is classified as treating source under 20 C.F.R. §§ 404.1502 and 416.902.[9] Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010) and *Hensley v. Astrue*, 573 F.3d 263

---

[9] A treating source, defined by 20 C.F.R. § 416.902, is
your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

(6th Cir.2009)).   This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ did not assign controlling weight to Dr. Durvasula's Mental Impairment Questionnaire. (Tr. 19.)   As the plaintiff correctly points out, even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)).   The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)), and so that the

plaintiff understands the disposition of her case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177

F.3d 128, 134 (2d Cir. 1999)).

The ALJ focused on the factor of inconsistency in concluding that Dr. Durvasula's Mental

Impairment Questionnaire should not be afforded any weight. (Tr. 19.) The ALJ explained that

> [n]o weight is given to Dr. Durvasula's opinion, as it is inconsistent with his [sic] own treatment notes, as well as with other credible evidence of record. The claimant told the consultative psychological examiner, Ms. [sic] Killian, that her medication worked very well at keeping her present discomfort to a minimum and that she was optimistic that things were going to get better for her. As previously discussed, the claimant demonstrated good concentration ability during the consultative psychological examination which was performed in January 2006. Dr. Durvasula's treatment notes indicated that in March 2006, the claimant offered no complaints and said that she was "doing alright" although she was not happy that her application for disability benefits was turned down.

*Id.*

On December 1, 2007, Dr. Durvasula completed a Mental Impairment Questionnaire and

diagnosed the plaintiff with moderate depression, anxiety, and panic attacks; assigned her a GAF

score of 50; and noted that she had poor concentration and was very easily stressed, that her

"psychiatric condition exacerbates [her] experience of pain or any other physical symptom," and that

her impairments or treatment would cause her to miss work more than three times a month. (Tr. 179-

80.) Dr. Durvasula also found that the plaintiff had moderate restrictions of activities and moderate

difficulties in maintaining social functioning; had constant "deficiencies of concentration,

persistence, or pace resulting in failure to complete tasks in timely manner;" and had continual

episodes of deterioration or decompensation. (Tr. 181.)

Although Dr. Durvasula's Mental Impairment Questionnaire indicates that the plaintiff's mental impairments significantly affected her ability to function, Dr. Durvasula's treatment notes from January of 2005 to February of 2008, belie those findings. (Tr. 182-83, 223-42.) First, Dr. Durvasula repeatedly opined that the plaintiff was alert and oriented, had organized thinking and an intact memory, and had fair concentration. *Id.* That contradicts the findings in Dr. Durvasula's Mental Impairment Questionnaire that the plaintiff had poor concentration and had constant "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in timely manner." (Tr. 179-80.)

Next, while Dr. Durvasula found that the plaintiff was depressed and anxious (tr. 223-25, 227, 231, 233-36, 239), the plaintiff reported to Dr. Durvasula that she was "doing alright" or "well" (tr. 182, 228, 231, 240), that her medications were working "okay" (tr. 183), that she had no complaints (tr. 231), and that Seroquel kept her irritability "in check." Dr. Durvasula also noted that the plaintiff's medications were not adjusted during her three years of treatment. (Tr. 182-83, 223-42.) Finally, Dr. Durvasula determined that the plaintiff's activities were moderately restricted (tr. 181), but the plaintiff reported to Dr. Durvasula that she took a trip to Las Vegas in July of 2006 (tr. 228) and testified that she is able to do laundry, able go to a neighbor's house to play cards or dominoes, and able to drive short distances. (Tr. 323-24.)

In sum, Dr. Durvasula's Mental Impairment Questionnaire was inconsistent with and not supported by her treatment notes from January of 2005 to February of 2008.[10] Therefore, the ALJ

_____

[10] The plaintiff argues that the ALJ erred in relying on the findings of Dr. O'Bryan and Mr. Killian since neither Dr. O'Bryan nor Mr. Killian considered Dr. Durvasula's medical findings

did not err in assigning no weight to Dr. Durvasula's Mental Impairment Questionnaire. He focused on the factor of inconsistency, provided "good reasons," as required by SSR 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2)), and there is substantial evidence in the record to support his determination.

### 3. The ALJ correctly determined that the plaintiff did not meet or medically equal Listing 12.04.

The plaintiff contends that the ALJ erred in concluding that she did not meet Listing 12.04 for affective disorders. Docket Entry No. 15, at 5-6. Specifically, she argues that she meets Listing 12.04 since she was diagnosed with depression and had "constant deficiencies of concentration which would result in her failure to complete tasks in a timely manner, and continual episodes of deterioration or decompensation in work or work-like settings." *Id.*

The plaintiff has the burden of proof at steps one through four of the sequential disability benefits analysis, including proving presumptive disability by meeting or exceeding a Medical Listing at step three. *Vance*, 260 Fed. Appx. at 803-04; *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff has the burden of proof at step three to demonstrate that "[she] has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238

_____

from 2007, which indicated that the plaintiff's condition was "worsen[ing] over time" Docket Entry No. 15 at 7-8. However, as discussed *supra*, at 17, Dr. Durvasula's treatment notes do not show that the plaintiff's condition worsened after Dr. O'Bryan and Mr. Killian evaluated her mental impairments. (Tr. 182-83, 223-42.)

F.2d 419, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)).  The plaintiff's impairment must meet

all of the listing's specified medical criteria and "[a]n impairment that meets only some of the

criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110

S.Ct. 885, 107 L.Ed.2d 967 (1990).  At step three,

> [i]f the claimant is *not performing substantial gainful work* and has a severe
> impairment (or impairments) that has lasted or is expected to last for a continuous
> period of at least twelve months, and [her] impairment (or impairments) meets or
> medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation
> No. 4, the claimant is disabled without further inquiry.

*Little*, 2008 WL 3849937, at *1 (emphasis added).  If the plaintiff demonstrates that her impairment

meets or equals a listed impairment, then the ALJ must find the plaintiff disabled. *Little*, 2008 WL

3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir.

1987)).

Listing 12.04 mandates a finding of disability when the requirements of both sections 12.04A

and 12.04B are met, or when the requirements of section 12.04C are met.[11] 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 12.04.  Section A requires the plaintiff to show that she has a medical history of either

depressive syndrome, manic syndrome, or bipolar syndrome, and she must meet the sub-

requirements for that disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A.  Since the plaintiff was

diagnosed with depression, she must show that her depression was characterized by at least four of

---

[11] Even though the ALJ addressed sections B and C of Listing 12.04, the Court will only
address sections A and B of Listing 12.04 and not section C, since the plaintiff specifically contends
that she meets sections A and B and not section C (Docket Entry No. 15, at 5-6), and because the
Regulations require the plaintiff to satisfy the requirements in both sections A and B in order to meet
Listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

the following nine characteristics: anhedonia or "pervasive loss of interest in almost all activities;" appetite disturbance with weight change; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking. *Id. See also Bush v. Astrue*, 2011 WL 3444072, at *7-8 (M.D. Tenn. Aug. 8, 2011) (Nixon, J.). In order to be found functionally limited under section B, at least two of the following four restrictions must be present: a marked restriction of activities of daily living;[12] marked difficulties in maintaining social functioning;[13] marked difficulties in maintaining concentration, persistence, or pace;[14] or repeated episodes of decompensation,[15] each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B.

---

[12] Pursuant to the regulations:
[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C1.

[13] The regulations define social functioning as "your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C2.

[14] The regulations define concentration, persistence, or pace as being "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C3.

[15] The regulations define episodes of decompensation as
exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily

The plaintiff argues that she meets the requirements of section A of Listing 12.04 since Dr. Durvasula's December 2007 Mental Impairment Questionnaire indicates that she had "decreased energy, hostility and irritability, generalized anxiety, difficulty in thinking and concentrating, feelings of guilt and worthlessness, sleep disturbance, mood disturbance, and psycho-motor agitation or retardation." Docket Entry No. 15, at 6; Tr. 179. However, as discussed *supra*, the ALJ correctly awarded no weight to that evaluation. Additionally, when Dr. Durvasula examined the plaintiff between January of 2005 to February of 2008, she did not find that the plaintiff had anhedonia or "pervasive loss of interest in almost all activities;" psychomotor agitation or retardation; decreased energy; or feelings of guilt or worthlessness, but she did note that the plaintiff never had any hallucinations or delusions, or suicidal ideations; that the plaintiff was alert and oriented, had organized thinking and an intact memory, and had fair concentration (tr. 182-83, 223-41); and that the plaintiff's sleep/appetite was "good" or "alright." (Tr. 183, 223, 239.) Although Dr. Durvasula's treatment notes address five of the nine categories in section A of Listing 12.04, her treatment notes do not indicate that the plaintiff was negatively impacted in any of those five categories. (Tr. 182-83, 223-41.)

The plaintiff also contends that she meets the requirements of section B of Listing 12.04 since Dr. Durvasula concluded that she "would have constant deficiencies of concentration which

---

living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C3.

would result in her failure to complete tasks in a timely manner, and continual episodes of deterioration or decompensation in work or work-like settings." Docket Entry No.15, at 6-7. First, as discussed previously, the ALJ correctly awarded no weight to Dr. Durvasula's December 2007 Mental Impairment Questionnaire. Next, Dr. Durvasula's treatment notes from January of 2005 to February of 2008 indicate that the plaintiff was alert and oriented, had organized thinking and an intact memory, and had fair concentration, but the treatment notes do not show that she exhibited any episodes of decompensation. (Tr. 182-83, 223-41)  The ALJ also explained that

> [w]ith regard to concentration persistence or pace, the claimant had mild difficulties. The psychological examiner indicated that the claimant exhibited little to no impairment in cognitive functions during the examination; that she easily performed serial sevens and made calculations involving complex functions; spelled "world" backwards on the first try; exhibited very good awareness of international and local events; and was able to recall four items after a delay of approximately 45 minutes. Significantly, the claimant reported that she was able to pay attention for as long as needed; that she could follow any written instructions given; and that she followed spoked instructions "very well."   As for episodes of decompensation, there is no evidence that the claimant has experienced any episodes of decompensation.

> Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.

(Tr. 16-17).  (internal citations omitted).

The plaintiff did not satisfy the requirements of section A or section B of Listing 12.04 since the record medical evidence does not indicate that her depression was characterized by at least four of the nine characteristics in section A and by two of the four requirements in section B. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A-B.  Thus, since the plaintiff failed to satisfy the requirements of section A and section B, she does not meet Listing 12.04.

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge